When Francis exercised the direct authority in the business that he did in the absence of Buchanan, although he had a secret writing appointing him agent, he did not deem it necessary to show it to the salesman or any one else, but proceeded to take the cash into his own custody from the till, daily, and direct who to credit and who not, with all the authority of a partner. The salesman, Mr. Lewis, don't seem to have had any question or doubt about his right to do so, independent of the writing, which he never saw or knew of, until it was produced in court.

## Case No. 5,032.

### The FRANCIS.

[1 Gall. 445.] 1

Circuit Court, D. Rhode Island. June Term, 1813.2

Wheaton, Burrill, and Dexter, for captors.
Mr. Searle, for claimants.

STORY, Circuit Justice. The question now before the court arises out of the claim of Messrs. Dunham and Randolph of New York, who claim, as their own property, sundry bales of merchandize, shipped to them on board the Francis, by Alexander Thompson of Glasgow. The Francis sailed from Greenock about the 19th of July, 1812, for New York, and on her passage was captured by the privateer Yankee, Oliver Wilson commander. By the papers on board, the goods appear to be shipped by Thompson, and consigned to the claimants. Several letters of Thompson accompany the bills of lading. In one of them, dated the 11th of July, 1812, after speaking of the shipments, one on board of the Fanny, and the other on board of the Francis, he says, "I have exceeded in some articles, I have sent you others not ordered at all, the reason of which is, I intended to have made a small shipment on my own account, but found the circumstances such, that it would have been very apt to create confusion and mistakes. I therefore concluded to send you the whole. I assure you, nothing has been wanting on my part to get every thing done in the best manner I could, but I wish to go on the most liberal and fair principles. I leave with yourselves to take the whole of the two shipments or none

1 [Reported by John Gallison, Esq.]
2 [Affirmed in 8 Cranch (12 U. S.) 354, and 9 Cranch (13 U. S.) 183.]

at all, just as you please. If you do **not** wish them, I will thank you to hand the invoices over to Messrs. Falconer, Jackson & Co. I think twenty four hours will afford you ample opportunity for you to make up your minds on this point. and if you do not hand them over within that time I will of course consider that you take the whole." In other parts of the letter the same proposition is repeated. Towards the close he says, "The premium of insurance is three guineas, warranted free from capture by the Americans. I presume there is no danger of their injuring the property."

In another letter, addressed to Messrs. Falconer, Jackson & Co. of New York, dated 15th of July, 1812. after acknowledging the receipt of letters from them of the 1st and 11th of June, 1812, he observes, "The government of the United States seem really to be in earnest about war, but there was such a train of circumstances occurred (the death of Perceval, &c.) that I think would induce them to wait the final result," &c. He then goes on to state the shipments by the Fanny and the Francis, and says, "I have had an order from Dunham & Randolph sent me for about a year, to be shipped when the orders in council were removed. I have sent them more of some articles, than they ordered, and some not ordered at all, the reason of which was, &c. I concluded to send them the whole, leaving it to their option to take them to account or not, just as they pleased; but if they took any, it must be the whole of both shipments or none at all. I gave them twenty-four hours after the arrival of the first vessel, to make up their minds, and if they did not hand you over the invoice of letters in that time, I would consider they had taken the whole to account. Should they not take them, you will of course do the best you can for me." It is conceded, that the Fanny was captured by a revenue cutter of the United States, and upon her arrival in the United States, which was before the Francis arrived. she was proceeded against in the proper judicial tribunal.

It has been argued, that under these circumstances the property of the goods, at the time of the shipment, actually vested in the claimants. subject however to be divested by their subsequent refusal to accept the same. But can this, by any reasonable construction, be so held? The shipment is conceded by the shipper not to have been made in conformity with the orders of the claimants, and that larger quantities of some goods. which were ordered, and other goods. which were not ordered, had been sent; and the shipper expressly declares, that the whole must be accepted, or none. Until the acceptance then, there could be no property in the claimants, even if the intentions of the shipper had been to vest that property; because no man can be bound, against his will, to take the risk of goods. for which he has not contracted. Here, however, there

was no such intention. The shipper plainly declares, that the goods were at his own risk, and on his own account, until the claimants should make their election. If the goods had been lost during the voyage, and before the arrival of the time of the election, there cannot be a doubt, that it would have been the loss of the shipper. I would adopt the language of Sir W. Scott, in the case of The Packet De Bilboa, 2 C. Rob. Adm. 133, "that it is the true criterion of property, that if you are the person on whom the loss will fall, you are to be considered as the proprietor." The argument therefore of the claimants' counsel, on this point, cannot be supported.

It has been suggested, that if the claimants can be admitted to the benefit of further proof, they will be able to show, that the Fanny arrived before the Francis, and that, previous to the capture of the latter, the claimants had made their election to receive the whole shipment. It is however admitted, that the Fanny was actually captured and brought into one of our ports, and underwent a judicial examination. It is somewhat difficult to conceive, how any election to take the property could have been effectually made, while it was emphatically in the custody of the law. But notwithstanding this objection, if I were satisfied that a legal defence could be shown to the court under an order for further proof, I should not hesitate to allow it. It is clear, however, to my mind, that the assumed defence could never prevail. At the time of the shipment the property was clearly hostile. And open and public war existed between Great Britain and the United States. By the general law, a state of war puts an end to all executory contracts between the citizens of the different countries. Whatever contract remains then in fieri is either suspended or dissolved. flagrante bello. A familiar instance is that of a contract of affreightment to the enemy country, which has been solemnly held to be dissolved by the breaking out of the war. It might therefore be exceedingly doubtful. if it were competent to citizens of the United States, after a knowledge of the war, to make or to ratify a contract with the public enemy. I do not, however, rely on this consideration. I consider it as a general principle. liable to very few exceptions. that the character of hostility impressed upon property cannot be altered during the voyage, or, as it is usually expressed, in transitu. A strong case of the application of this principle is The Danckebaar Africaan, 1 C. Rob. Adm. 107. An exception to the rule is, when the transfer is made in a time of profound peace. without reference to a contemplation of hostilities. The Vrow Margaretha, 1 C. Rob. Adm. 338. If it were necessary, I might draw in aid the principles of these decisions, because it is clear that, at the time of the shipment, hostilities had actually commenced and were in the contemplation of the shipper. The whole papers and

documents, read in this cause, point to the expectation, as one of public notoriety. And upon the ground assumed by the claimants' counsel, that the election of the claimants vested in them the property during its transit, it would follow, that the case would be comprehended within the general rule of illegal transfers, during hostilities actually existing or imminent.

But I do not rest the present claim upon this ground alone. I consider it a clear principle, that the property of an enemy, going to a neutral or a friend, to be his at his election at the end of the voyage, remains, during the whole voyage, as to the claim of belligerents, enemy's property. It is not competent for the neutral or friend, during the voyage, to change by his election the character of hostility, which is attached to the property at its shipment. During the whole voyage it must be subject to the shipper's right of stoppage in transitu; and this right, by the capture, becomes legally and effectively vested in the captors. I do not undertake to say, how the case might stand, as between the shipper and the consignee, upon such election being made; it will be time enough to decide that question when the case arises. But where the interests of third persons intervene, the right of election cannot defeat their rights; and the laws of belligerent capture would remain a mere theoretical system, if the doctrine contended for by the claimants should prevail. In my judgment, the great principles of national law require, that no secret liens, no future elections, no private contracts looking to future events, should cloak with the garbs of neutrality the property of an enemy, while sailing on the ocean. I know not that any person could foresee the alarming extent, to which the contrary doctrine would lead us. Frauds of every name and character would thicken around us and not a single bale of hostile property would swim on the ocean, but it would be covered with neutral liens, and secret and interminable contracts. Against the adoption of principles, which would lead to this inevitable result, I beg to enter my solemn dissent.[3]

In the present case, I feel myself bound to declare, that I see no fraud properly imputable to the claimants; they are innocent. But the rule cannot be relaxed in their favor: and I feel some consolation, that the loss, which will accrue, will in no event rightfully fall on them. Claim rejected. Decree of condemnation.

[3] The Josephine, 4 C. Rob. Adm. 25. and The Aurora, 4 C. Rob. Adm. 218, are strongly applicable to this case.